UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------X

ISRAEL CUCUL and ELIZABETH LORENZO,

                  *Plaintiffs,*

   -against-

MAJOR CLEANING, INC., ADELSON DESOUZA,
BROADWAY HOSPITALITY VENTURE, LLC d/b/a
BOND 45 ITALIAN KITCHEN AND BAR,
HURRICANE STRAUSS, INC. d/b/a WESTVILLE
CHELSEA, WESTVILLE RESTAURANT, INC.
d/b/a WESTVILLE EAST, BOUCHERIE PAS LLC
d/b/a BOUCHERIE UNION SQUARE, and
FIORELLO'S ROMAN CAFE, INC. d/b/a CAFÉ
FIORELLO,

                  *Defendants.*

--------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**

22-CV-601(KAM)(CLP)

**KIYO A. MATSUMOTO, United States District Judge:**

     On February 2, 2022, Plaintiffs Israel Cucul and Elizabeth Lorenzo (the "Plaintiffs") brought this action asserting claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., ("FLSA"), the New York Labor Law ("NYLL"), and the New York City Code, Rules, and Regulations, against Major Cleaning, Inc. and Adelson Desouza (together, the "Major Cleaning Defendants"). (ECF No. 1, Complaint.) Plaintiffs later amended their complaint twice to assert the same claims against additional defendants Boucherie Pas LLC d/b/a Boucherie Union Square ("Boucherie"), Broadway Hospitality Venture, LLC d/b/a Bond 45 Italian Kitchen and Bar

1

("Bond 45"), Fiorello's Roman Café, Inc. d/b/a Café Fiorello ("Fiorello", and with Bond 45, the "B&F Defendants"), Hurricane Strauss, Inc. d/b/a Westville Chelsea, and Westville Restaurant, Inc. d/b/a Westville East (collectively, the "Westville Defendants") (the Boucherie, B&F Defendants, and Westville Defendants together are referred to as the "Restaurant Defendants"). (*See* ECF No. 23, First Amended Complaint; ECF No. 49, Second Amended Complaint ("SAC").)

Presently before the Court is the Restaurant Defendants' and Major Cleaning Defendants' motions to dismiss Plaintiff's fifth and sixth causes of action in the SAC, pursuant to Fed. R. Civ. P. 12(b)(1), and the Restaurant Defendants' motion to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6). (*See* ECF No. 58, Major Cleaning Defendants' Notice of Motion to Dismiss; ECF No. 61, Restaurant Defendants' Notice of Motion to Dismiss.) For the reasons set forth below, Defendants' motions are **GRANTED**.

<u>**BACKGROUND**</u>

The Court accepts the allegations in the Plaintiffs' Second Amended Complaint as true for purposes of the Motion to Dismiss. *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016).

## I. Factual Background

Plaintiffs Israel Cucul ("Cucul") and Elizabeth Lorenzo ("Lorenzo") worked at various times between 2017 and 2021, and in

various capacities, as overnight cleaning or janitorial workers in a variety of restaurants throughout New York City. (*See generally* SAC at ¶¶30-105.)  Cucul and Lorenzo were not directly employed by the Restaurant Defendants, however, and instead were staffed by and received their wages from the Major Cleaning Defendants. (*See, e.g., id.* at ¶¶35, 47, 56, 57, 69, 82, 92, 95.)  Plaintiffs were paid various rates of pay at each of their various assignments, varying from not receiving wages at all to $400 per week depending on the assignment. (*Id.* at ¶¶47, 105.)  Plaintiffs' hours worked varied between 56 hours per week (8 hours per day, every day) and 84 hours per week (12 hours per day, every day) depending on the assignment. (*Id.* at ¶¶38, 59, 84, 97.)  Plaintiffs did not receive written wage statements or documentation regarding their hours worked and were paid at a fixed weekly rate entirely in cash. (*Id.* at ¶¶47, 121-23.)

According to the SAC, Plaintiff Cucul worked at Bond 45 for just over four months – between September 3, 2017, and January 14, 2018. (*Id.* at ¶35.)  Thereafter, Plaintiff Cucul worked at Westville Chelsea for over 19 months, from January 15, 2018, through August 22, 2019, and for nearly 7 months at Westville East, from August 23, 2019, through March 20, 2020. (*Id.* at ¶¶56-57.)  Plaintiff Lorenzo worked alongside Plaintiff Cucul at Westville East from September 28, 2019, through March 20, 2020, a period of nearly six months. (*Id.* at ¶¶76-77.)  Both Plaintiffs worked at

Boucherie beginning on August 8, 2021, "for approximately one month." (*Id.* at ¶82.) Finally, "for approximately a one-week period in or around December 2021," both Plaintiffs worked at Fiorello. (*Id.* at ¶95.) The SAC does not allege any further employment by either of the Plaintiffs by any Defendants after December 2021.

According to Plaintiffs, the Defendants, as joint employers within the meaning of the FLSA and the NYLL (*id.* ¶108), did not pay them a minimum wage, overtime for hours worked in excess of 40 hours per week, or spread-of-hours pay for workdays lasting longer than ten hours, (*id.* ¶¶116-20, 126-27). Plaintiffs also claim that the Defendants did not maintain employee records as required by the NYLL and did not provide wage statements as required under New York law. (*Id.* ¶¶121-25.) Plaintiffs seek unpaid wages, statutory penalties, liquidated damages and attorneys' fees and costs. (*Id.* at pp. 23-24.)

## II. Procedural History

Plaintiffs commenced the instant case on February 2, 2022. (*See generally* Complaint.) Plaintiffs' original complaint included only claims as to the Major Cleaning Defendants, noting with regards to the Restaurant Defendants only that Plaintiffs "cleaned restaurants during the overnight shift, after the restaurants had closed." (*Id.* at ¶¶21, 25.) Plaintiffs served the complaint and summons on the Major Cleaning Defendants, who

4

both failed to appear, and Plaintiffs thereafter moved for default judgment on July 26, 2022, as to both Defendants. (*See* ECF No. 11, Motion for Default Judgment.)  Prior to the Court ruling on the pending Motion for Default Judgment, the Major Cleaning Defendants appeared, represented by counsel, and requested an extension of time to answer the Complaint, which was granted by Magistrate Judge Pollak. (*See* ECF No. 13; Docket Order dated September 7, 2022.)  The Major Cleaning Defendants subsequently filed an answer to the Complaint on September 8, 2022, and the pending motion for default judgment was withdrawn by Plaintiffs during the October 24, 2022, Initial Conference before Magistrate Judge Pollak. (*See* ECF No. 17, Answer to Complaint; Minute Entry dated October 24, 2022.)

Plaintiffs and the Major Cleaning Defendants attempted to resolve the matter through mediation on December 14, 2022, but were unable to do so, and proceeded to discovery. (ECF No. 20, Letter to Magistrate Judge Pollak.)  On April 10, 2023, on consent of the Major Cleaning Defendants, Plaintiffs filed a Joint Stipulation to amend the complaint pursuant to Fed. R. Civ. P 15(a)(2), (ECF No. 22), and thereafter filed an amended complaint, (ECF No. 23, First Amended Complaint ("FAC")).  The FAC was a significant amendment to the complaint, adding the Restaurant Defendants as named defendants for the first time, and asserting that Plaintiffs were "employed by each of the Restaurant

Defendants," who were "jointly and severally liable with the [Major Cleaning] Defendants for all violations alleged herein." (*Id.* at ¶¶31, 35.)   Following appearance of counsel on behalf of the Restaurant Defendants, both the Major Cleaning Defendants and the Restaurant Defendants requested a pre-motion conference to discuss anticipated motions to dismiss, and the conference was held on July 6, 2023.   (Minute Entry dated July 10, 2023.)   At the conference, the Court granted Plaintiffs leave to file a "final amended complaint" by July 20, 2023.   (*Id.*)

Plaintiffs filed the SAC on July 20, 2023, including additional factual detail as to each of the Restaurant Defendants, among other changes.  (*See generally* SAC.)   Each of the Defendants subsequently filed letters indicating they would seek to dismiss the SAC, and a briefing schedule was ordered on consent of the parties on August 24, 2023.  (Docket Order dated August 24, 2023.) The Restaurant Defendants filed a consolidated motion to dismiss, the Major Cleaning Defendants filed a separate motion to dismiss, and Plaintiffs filed a single opposition addressing both motions. (*See* ECF No. 56, Letter regarding Joint Proposed Briefing Schedule.)   Both motions to dismiss were fully briefed on November 9, 2023.  (*See* ECF No. 58, Major Cleaning Defendants' Notice of Motion to Dismiss; ECF No. 59, Major Cleaning Defendants' Memorandum of Law in Support of their Motion to Dismiss ("MC Mem."); ECF No. 60, Major Cleaning Defendants' Affidavit in

Support; ECF No. 61, Restaurant Defendants' Notice of Motion to Dismiss; ECF No. 62, Restaurant Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Restaurant Mem."); ECF No. 63, Plaintiffs' Memorandum of Law in Opposition ("Pl. Opp."); ECF No. 64, Plaintiffs' Affidavit in Opposition; ECF No. 65, Major Cleaning Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss ("MC Reply"); ECF No. 66, Restaurant Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss ("Restaurant Reply").)

**LEGAL STANDARD**

## I.  Motion to Dismiss under Rule 12(b)(1)

Federal courts have inherent power under Rule 12(b)(1) to dismiss claims for which subject matter jurisdiction is lacking. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).  In considering a motion to dismiss under Rule 12(b)(1), the "[C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff."  *Id.* (internal quotation marks and citation omitted).  The Court may also "consider evidence outside the pleadings," in considering a Rule 12(b)(1) motion.  *Id.* (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

"An objection to standing is properly made on a Rule 12(b)(1) motion."  *Tasini v. N.Y. Times Co.*, 184 F. Supp. 2d 350, 354-55 (S.D.N.Y. 2002) (citing *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 88-89 (1998)).  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To survive a Rule 12(b)(1) motion to dismiss, there must be facts plausibly establishing that the plaintiff has standing to sue. *Carter*, 822 F.3d at 56-57.

## II. Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  Although "detailed factual allegations" are not required, "[a] pleading that offers labels or conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

Both the Major Cleaning and the Restaurant Defendants move to dismiss the Plaintiffs' fifth and sixth causes of action, regarding violations of the NYLL's wage statement and wage notice provisions, arguing that Plaintiffs have failed to plead a concrete injury

8

sufficient for Article III standing. (*See generally* MC Mem.; Restaurant Mem.)  The Restaurant Defendants separately move to dismiss the complaint for failure to state a claim, arguing that Plaintiffs have failed to allege sufficient facts to establish the Restaurant Defendants' status as a joint employer under the FLSA and NYLL. (Restaurant Mem. at 8-23.)  "Where, as here, the defendant[s] move[] for dismissal under Rule 12(b)(1) . . . as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first." *U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993) (internal quotation marks and citation omitted).  Accordingly, the Court first addresses the Major Cleaning and Restaurant Defendants' Rule 12(b)(1) arguments, followed by the Restaurant Defendants' Rule 12(b)(6) arguments.

## I.   Standing

### A.   Legal Standard

"Federal courts are courts of limited jurisdiction that possess only that power authorized by [the] Constitution and statute." *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015) (internal quotation marks omitted).  "The irreducible constitutional minimum of standing derives from Article III, Section 2 of the U.S. Constitution, which limits federal judicial power to cases and controversies." *Nat. Res. Def. Council, Inc.*

*v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013 (internal quotation marks and citations omitted).

To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)) (hereafter *TransUnion*). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks and citation omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), as revised (May 24, 2016). At the pleading stage, a plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest that [he or she] has standing to sue." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (internal quotation marks and citation omitted).

**B.   Analysis**

Defendants[1] argue that Plaintiffs lack Article III standing to assert their wage statement (fifth cause of action) and wage notice (sixth cause of action) claims because the SAC fails "to allege facts supporting injury in fact arising from . . . Defendants' alleged violations of these technical statutory requirements." (MC Mem. at 1.)   Plaintiffs counter that "the SAC expressly pleads concrete injuries to Plaintiffs and expressly links those injuries to Defendants' wholesale failure to provide any of the wage notices and statements mandated under New York law." (Pl. Opp. at 20.)   Specifically, Plaintiffs argue that "Defendants' wage violations 'would have been obvious and immediately apparent' had they provided wage notices or statements to Plaintiffs, and that Defendants' failure to provide these 'contributed to Defendants' ability to perpetuate' their wage violations." (*Id.* at 26 (quoting SAC at ¶¶124-25).)

This Court has previously considered pleadings involving alleged violations of New York's wage notice and wage statement laws and concluded--in light of the Supreme Court's guidance in *TransUnion*--that the plaintiffs failed to sufficiently plead a concrete injury sufficient for Article III standing. *See, e.g.,*

---

[1] Both the Major Cleaning Defendants and the Restaurant Defendants each separately argue that Plaintiffs lack Article III standing for the wage notice and wage statement claims. (*See generally* MC Mem.; Restaurant Mem.)  Because the SAC does not differentiate between the two groups of Defendants with regard to the wage notice and wage statement claims, (*see* SAC at ¶¶121-25), the Court will address the arguments together.

*Sanchez v. Trescly*, No. 19-CV-4524 (KAM)(PK), 2023 WL 2473070, at
*1 (E.D.N.Y. Mar. 13, 2023); *Zabrodin v. Silk 222, Inc.*, No. 22-
CV-7064 (KAM), 2023 WL 8009319, at *5 (E.D.N.Y. Nov. 20, 2023);
*Proano v. Melrose Home Improvement Corp.*, No. 22-CV-6050 (KAM),
2023 WL 8003303, at *4 (E.D.N.Y. Nov. 17, 2023).  Those previous
cases involved pleadings which "merely allege[d] that Defendants
failed to comply with the[] statutory mandates," however, and did
not involve any alleged "tangible downstream harm flowing from the
statutory violations." *See, e.g., Proano*, 2023 WL 8003303, at *4.

Plaintiffs argue that because these cases (and other cited by
the Defendants) have an "absence of any allegations of injury,"
they "have no bearing on the SAC, which amply spells out how
Defendants' [wage notice and wage statement] violations resulted
in economic harm to Plaintiffs."  (Pl. Mem. at 32.)  Plaintiffs
are correct that the instant case is distinguishable from much of
the precedent cited by Defendants, which involves complaints
containing no allegations whatsoever regarding harm caused by the
failure to provide wage statements or wage notices.  (*Id.* at 30-
31.)  The Court's analysis does not end there, however, as the
question of whether Plaintiffs' particular alleged harms satisfy
the Article III pleading standard remains.

As discussed *supra*, Plaintiffs' allegations of harm arising
out of the wage statement and wage notice violations are mainly
informational.  According to the SAC, had the Defendants "properly

12

documented Plaintiffs' pay or hours," their "violations of New York Labor Law pay requirements would have been obvious and immediately apparent." (SAC at ¶124.) The Court is not convinced that this constitutes a concrete injury for purposes of Article III standing. As the Supreme Court has stated, "[a]n asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442 (citation omitted). Rather, Plaintiffs must identify some "downstream consequences from failing to receive the required information." *Id.*

Examining cases within the circuit in which a plaintiff's wage statement or wage notice claim survived dismissal post-*TransUnion*, the Court is able to identify some trends. In *Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-CV-10104 (ER)(KHP), 2023 WL 2674743 (S.D.N.Y. Mar. 29, 2023), the district court found that "for nearly nine months [Plaintiffs] did not know they were not receiving due compensation, and they were thereby prevented from obtaining their earned pay." *Id.* at *6. In *Lipstein v. 20X Hosp. LLC*, No. 22-CV-04812 (JLR)(JW), 2023 WL 6124048 (S.D.N.Y. Sept. 19, 2023), the district court found that the plaintiff's failure to "receive information about his rate of pay and accurate wage statements . . . hurt his ability to assess whether he was being properly paid and therefore promptly raise issues of underpayment with his employer." *Id.* at *9. In both cases, the district courts found that the failure to provide wage

statements contributed to the plaintiff's delays in seeking redress for their underpayment, which constituted an injury in fact. *See, e.g., id.; Metcalf,* 2023 WL 2674743 at *6. Without commenting on whether the cited cases were correctly decided, the Court does not find their reasoning applicable to Plaintiffs' action.

*Metcalf* involved circumstances where wage statements would have been obviously useful to the plaintiffs in determining that they had been underpaid. The case was brought by employees of TransPerfect, a corporate language servicers provider, on behalf of themselves and other "TransPerfect salaried employees who were compensated less than $1,125 per week while working overtime in the New York City office between December 31, 2018 and January 13, 2020." *Metcalf*, 2023 WL 2674743, at *1. This class was based on the "change in New York law effective January 1, 2019 [which] increased the base salary amount needed to categorize an employee as exempt from overtime to $1,125." *Id.* at *2 (citation omitted). Plaintiffs assert that they became non-exempt employees at the time the law became effective, as their salaries remained below $1,125 per week, but TransPerfect "did not notify plaintiffs of their change in status or provide them with their regular hourly and overtime rates of pay." *Id.* Neither TransPerfect nor the plaintiffs were aware of the mistake until "September 17, 2019, nearly nine months after the statutory change of the overtime

exemption amount, [when] TransPerfect realized that it had not paid plaintiffs the appropriate salary rate to maintain their exempt status." *Id.* At that point, TransPerfect "made retroactive payments to remedy the mistake" which the plaintiffs contended were insufficient. *Id.* Based on that factual background, the Plaintiffs argued "that had they been provided with the required [accurate wage statements], they would have been able to determine whether they were being underpaid and by what amount." *Id.*

In the instant case, by contrast, the link between wage statements and the harm suffered by Plaintiffs is not as clear. Plaintiffs argue that, had they been provided wage statements, the Defendants' "violations of New York Labor Law pay requirements would have been obvious and immediately apparent," but the SAC is devoid of any factual statements that either Plaintiff was *actually* unaware that they were being underpaid. (SAC at ¶124.) As compared to *Metcalf*, in which the failure to provide accurate wage statements resulted in both employer and employees being unaware of the underpayment until several months after the fact, 2023 WL 2674743, at *2, here, Plaintiffs fail to plead that such a delay occurred. As a result, even assuming that "[t]he delay in compensation that results when someone lacks the full information needed to advocate for appropriate wages deals an injury that is distinct from any underpayment itself," *Lipstein*, 2023 WL 6124048, at *10, the SAC fails to show that the failure to receive wage

15

statements or wage notices *actually* delayed Plaintiffs from seeking redress for Defendants' alleged violations of the FLSA and NYLL. Instead of alleging facts showing that Plaintiffs were delayed in recognizing they were underpaid or otherwise harmed, the SAC appears to allege a "legal conclusion couched as a factual allegation," which the Court is "not bound to accept as true." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Given the lack of facts regarding the harm caused by the failure of Defendants to provide wage notices or wage statements, the Court concludes that although Plaintiffs have argued that such informational injury *could* result in "downstream consequences," making such a finding here in the absence of supporting factual allegations would be speculative. *See Quieju v. La Jugueria Inc.*, No. 23-CV-264 (BMC), 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023) (dismissing plaintiff's wage notice and wage statement claims as "entirely speculative" and based on a "hypothetical chain of events"). Therefore, the Court finds that Plaintiffs have failed to properly plead the "adverse effects" that actually resulted from their "asserted informational injury," and therefore cannot satisfy the requirements of Article III. *TransUnion*, 594 U.S. at 442.

## II. Statute of Limitations

Although not raised by the Restaurant Defendants, "a court may raise [a statute of limitations defense] *sua sponte* when 'the

facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.'" *Weaver v. Boriskin*, 751 F. App'x 96, 98–99 (2d Cir. 2018) (quoting *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011)).  "The FLSA's limitations period for minimum wage and overtime claims is two years, unless the employer's violation is willful, in which case the period is three years." *Mendez v. MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 208 (E.D.N.Y. 2021); *see also* 29 U.S.C. § 255(a).  Plaintiffs' first amended complaint was filed on April 11, 2023, (ECF No. 23), and the Restaurant Defendants were neither named nor mentioned in the original complaint which, accordingly, does not relate back.  *See* Fed. R. Civ. P. 15(c)(1)(C).  Thus, even assuming the alleged violations by the Restaurant Defendants were willful, any violation predating April 11, 2020, three years prior to the filing of the amended complaint, would be untimely and barred by the FLSA's statute of limitations, and Plaintiffs allege no conduct by either Bond 45 or the Westville Defendants taking place after March 20, 2020.  (*See* SAC at ¶¶35, 56-57.)  By contrast, the claims against Boucherie and Fiorello, which occurred no earlier than August 8, 2021, are timely under the two-year statute of limitations.  (*Id.* at ¶82.)  No such defect is present in the NYLL claims against each of the Restaurant Defendants, which are governed by a six-year statute of limitations.  NYLL § 198(3).  Because the FLSA claims against Bond

17

45 and the Westville Defendants are untimely and Plaintiffs do not claim diversity jurisdiction applies, the Court lacks original subject matter jurisdiction over the NYLL claims asserted against Bond 45 and the Westville Defendants.  *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).

"[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'"  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Id.* at 122 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988)).  Weighing the values of judicial economy, convenience, fairness, and comity, the Court will exercise supplemental jurisdiction over the remaining state law claims against Bond 45 and the Westville Defendants in the instant case.  Plaintiff's allegations of joint employment by the Restaurant Defendants do not present "novel or unresolved questions of state law" that would implicate comity. *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 306 (2d Cir. 2003). Judicial economy and convenience is served by retaining and exercising supplemental jurisdiction, because both parties have fully briefed the motion to dismiss, including on the state law

claims, and as such, it is ripe for a decision.   Finally, principles of fairness weigh in favor of retaining jurisdiction, as Plaintiffs have already been afforded an opportunity to amend their complaint.   Accordingly, the Court will exercise supplemental jurisdiction over the remaining NYLL claims against Bond 45 and the Westville Defendants.

## III. Employer-Employee Relationship

### A.   Definition of "Employer" under the FLSA and NYLL

In order for a defendant to be liable under the FLSA or NYLL for any cause of action, that defendant must have been the plaintiff's "employer."[2]   "The Supreme Court has recognized 'that broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency.'"   *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).   As a result, the Supreme Court "has consistently construed the [FLSA] liberally to apply to the

---

[2] "Courts have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA." *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 37 (E.D.N.Y. 2015); *see also Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 132 n.19 (S.D.N.Y. 2020) (collecting cases); *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 261 n.3 (E.D.N.Y. 2018) (collecting sources).   Although "the New York Court of Appeals has not yet resolved whether the NYLL's standard for employer status is coextensive with the FLSA's . . . there is no case law to the contrary." *Leo v. Province Therapeutics, LLC*, No. 23-CV-5418 (NJC)(JMW), 2024 WL 456824, at *8 (E.D.N.Y. Feb. 6, 2024) (quoting *Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 258 (E.D.N.Y. 2015)).

furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found.*, 471 U.S. at 296 (internal quotation marks and citation omitted). The FLSA defines the term "employ" broadly, noting that it "includes to suffer or permit to work." 29 U.S.C. § 203(g). "Unfortunately, however, the statute's definition of 'employer' relies on the very word it seeks to define: 'Employer includes any person acting directly or indirectly in the interest of an employer in relation to an employee.'" *Irizarry*, 722 F.3d at 103 (quoting 29 U.S.C. § 203(d)). The term "employer" itself is not further defined in the statute. *Id.*

Notwithstanding the lack of a definition for the term "employer," the Second Circuit has observed "that the striking breadth of the FLSA's definition of 'employ' stretches the meaning of employee to cover some parties who might not qualify as such under a strict application of traditional agency law principles in order to effectuate the remedial purposes of the act." *Irizarry*, 722 F.3d at 104 (internal quotation marks and citation omitted). As such, "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Id.* (quoting *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008)). Because the Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the

circumstances [it has] identified different sets of relevant factors based on the factual challenges posed by particular cases." *Id.* Two[3] such tests are set forth in *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984) and *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61 (2d Cir. 2003)

The *Carter* test considers whether an entity has "formal control over workers." *Barfield,* 537 F.3d at 143. Although a finding of formal control "can be *sufficient* to establish employment status," the Second Circuit has not held such a finding to be "*necessary* to establish an employment relationship." *Id.* (emphasis in original) (citation omitted). Utilizing the *Zheng* test, courts analyze whether the alleged employer "has functional control over workers even in the absence of [] formal control." *Zheng*, 355 F.3d at 72. The Second Circuit has noted that the *Zheng* test can be relevant in situations where an employee alleges joint employment by multiple defendants. *Id.* at 70; *see also Greenawalt v. AT & T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016).

**B.  Formal Control**

Under the *Carter* test used to determine whether an alleged employer has "formal control" over employees, "the relevant

---

[3] The third test, set forth in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), focuses on whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves," *id.* at 1059, and thus is "typically more relevant for distinguishing between independent contractors and employees," *Velez v. Sanchez*, 693 F.3d 308, 326 (2d Cir. 2012), than for determining by whom workers who are assumed to be employees are employed.  No party argues that the *Brock* test applies here.

factors include 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter*, 735 F.2d at 12). "No one of the four factors standing alone is dispositive." *Id.* (citation omitted).

The Restaurant Defendants argue that the SAC fails to sufficiently allege that the Restaurant Defendants exercised formal control over Plaintiffs, (Restaurant Mem. at 8-23), and the Court agrees. Plaintiffs appear to concede this point in their opposition to the Motion to Dismiss, focusing instead on the functional control test set out in *Zheng*. (Pl. Opp. at 11-12.) Plaintiffs are correct that "[e]ven absent 'formal control,' . . . a plaintiff can sustain a claim of joint employment." (*Id.* at 11.) Notwithstanding that correct statement of the law, the Court will examine whether the Restaurant Defendants exercised formal control over Plaintiffs before determining whether the functional control test is appropriate.

*First,* Plaintiffs do not allege any facts suggesting that any of the Restaurant Defendants had the power to hire or fire Plaintiffs from their position. Indeed, the SAC reflects that when an employee of one of the Restaurant Defendants, Bond 45,

22

informed Defendant Cucul that he would not be able to work at the restaurant for "several days" following an injury, Desouza "arranged for Cucul to begin working at a restaurant controlled and operated by Westville Chelsea" instead. (SAC at ¶¶54-55.)  No facts are present in the SAC that would suggest any power by the Restaurant Defendants to hire or fire Plaintiffs from their position as employees of the Major Cleaning Defendants.

*Second,* the Plaintiffs do not adequately allege that the Restaurant Defendants controlled their work schedule or supervised their work conditions.  There are no allegations in the SAC that the Restaurant Defendants controlled Plaintiffs' work schedules. The SAC notes that Plaintiff Cucul "would generally discuss" his schedule with a Westville employee and "Alvaro [Last Name Unknown]," his supervisor from Major Cleaning, but never alleges that the Westville Defendants, or any of the other Restaurant Defendants, actually controlled either of the Plaintiffs' work schedules. (*Id.* at ¶68.)  Furthermore, Plaintiff Cucul does not allege that his hours ever varied while working for the Westville Defendants, as the SAC states that he "generally worked at the Westville Restaurants . . . every day, seven days a week, commencing at approximately 10:00 p.m. and continuing through approximately 6:00 a.m." (*Id.* at ¶59.)

As regards supervision, the SAC includes several allegations regarding each of the Restaurant Defendants, but the Court does

not find that the allegations support a finding of formal control. For example, the SAC alleges that at Bond 45 "Cucul worked under the supervision of Bond 45 supervisors and staff, who, among other things, inspected his work and directed him to perform various tasks." (*Id.* at ¶44.)  The SAC is silent regarding any specifics as to the nature of the supervision or the identity of the supervisor at Bond 45.   Similarly, regarding the Westville Defendants, the SAC alleges that a number of named Westville employees were present, supervised Plaintiff Cucul's work, and "directed him to perform various tasks," but offers no factual specifics regarding the nature of the supervision. (*Id.* at ¶¶64-65.)

Notwithstanding the fact that the SAC is light on factual specifics regarding day-to-day supervision of Plaintiffs by the Restaurant Defendants or their employees, it includes facts which show that the Major Cleaning Defendants controlled Plaintiffs' work schedule and supervised their work conditions.  Each time Plaintiffs were assigned to clean a new restaurant, including when Plaintiff Cucul was told not to work at Bond 45 after being injured, they were "staffed [by] Major Cleaning and Desouza." (*Id.* at ¶¶35, 55-57, 82, 95.)  During the period in which Plaintiff Cucul was working at Bond 45, the SAC states that between approximately 1:00 a.m. and 6:00 a.m. each morning, Cucul was not supervised by any Bond 45 staff, and instead, Alvaro, an employee

24

of Major Cleaning, would, on certain occasions, arrive and spend an hour inspecting "the quality and progress of the Daily Cleaning Services that Cucul performed." (*Id.* at ¶46.)  Although the SAC alleges that "[g]enerally, at least one supervisor[4] was present at all times" while Plaintiff Cucul worked at the premises of the Westville Defendants, it also states that Alvaro of Major Cleaning would "would generally arrive at the Westville Restaurants every day for approximately one hour to inspect the quality and progress of the Daily Cleaning Services that Cucul performed." (*Id.* at ¶¶65, 67.)  Similar to Bond 45, while working at Boucherie and Fiorello, the SAC alleges that Plaintiffs only worked alongside restaurant staff between 9:00 p.m. and 1:00 a.m., and that restaurant staff members (as opposed to Major Cleaning employees) were present between 1:00 a.m. and 7:00 a.m. only intermittently. (*Id.* at ¶¶89-90, 103.)  Similar to the other restaurants, "Alvaro would generally arrive at the Boucherie Restaurant three times a week for approximately 30 minutes" and "would generally arrive at the Fiorello Restaurant every day for approximately 30 minutes to inspect the quality and progress of the Daily Cleaning Services that Plaintiffs performed." (*Id.* at ¶¶91, 104.)

---

[4] Although it is not specified, the Court infers that Plaintiffs are alleging the presence of a *Westville* supervisor, based on the statement that Plaintiff Cucul "worked . . . under the supervision of supervisors and staff of the Westville Defendants" in the paragraph immediately prior. (SAC at ¶64.)

25

Courts within this circuit have noted that "[i]nfrequent inspections 'for the purposes of quality control . . . have [been] recognized as insufficient to establish joint employer status.'" *Lopez v. Puri*, No. 20-CV-3450 (AMD)(MMH), 2022 WL 20527200, at *4 (E.D.N.Y. Sept. 19, 2022) (quoting *Hugee v. SJC Grp., Inc.*, No. 13-CV-423 (GBD), 2013 WL 4399226, at *6 (S.D.N.Y. Aug. 14, 2013)); *see also Godlewska v. HDA*, 916 F. Supp. 2d 246, 259 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014) ("Exercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions.").

The SAC also alleges that Plaintiffs "would not leave" some of the restaurants "without first checking in" with employees of that restaurant "to ensure that no further work was required." (SAC at ¶¶45, 66.)  As with the other facts alleged in the SAC, these allegations are consistent with the restaurants conducting quality checks of the Plaintiffs' work, and not day-to-day control of Plaintiffs' work and schedule.  The Court further notes that the SAC, even construed broadly, does not include facts that would suggest Plaintiffs *could not* leave the restaurants without the permission of the Restaurant Defendants.  Therefore, although Plaintiffs have alleged some level of oversight by the Restaurant

26

Defendants, the Court does not find that it rises to the level of formal control.

*Third,* Plaintiffs do not offer any facts in the SAC that suggest the Restaurant Defendants determined the Plaintiffs' rate or method of pay.  The SAC alleges that Plaintiffs were paid, during the periods they received pay, in cash received "from Desouza or his agents."  (SAC at ¶¶47, 69, 92.)  The SAC further states that on certain occasions "Desouza made deductions from [Plaintiffs'] wages" due to "purported complaints" from the Restaurant Defendants.  (*Id.* at ¶¶49, 71, 94.)  The SAC does not state that the Restaurants *actually* made any such complaints to Desouza, or requested any change to Plaintiffs' pay based on the purported complaints.

Furthermore, although the SAC alleges "upon information and belief" that "the amounts paid by the Restaurant Defendants to Major Cleaning did not meet the minimum wage thresholds . . . necessary to compensate staff placed with the Restaurant Defendants for all their hours worked," Plaintiffs offer no facts in support of this allegation.  (*Id.* at ¶34.)  The Second Circuit has recognized that "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of

culpability plausible." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Nonetheless, a plaintiff cannot "merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). Factual allegations made on information and belief must "be accompanied by a statement of the facts upon which the belief is founded." *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 461 (S.D.N.Y. 2016) (internal quotation marks omitted), *aff'd*, 759 F. App'x 42 (2d Cir. 2019). Here, the SAC is silent regarding the basis for the information and belief that "the amounts paid by the Restaurant Defendants to Major Cleaning did not meet the minimum wage thresholds," and therefore the Court does not credit the allegation as more than a conclusory statement. Because there are no other facts in the SAC speaking to the Restaurant Defendants' role in determining Plaintiffs' rate or method of pay, the Court finds that this factor weighs against a finding of formal control.

*Fourth*, the SAC does not allege that any of the Defendants in the instant case maintained employment records. "While willful failure to comply with the requirements of the FLSA and the NYLL should not cut against a finding of formal control by a defendant who was responsible for tracking a plaintiff's hours, Plaintiffs here do not allege that the [Restaurant Defendants] bore that responsibility." *Abuladze v. Apple Commuter Inc.*, No. 22-CV-8684

28

(GHW)(RFT), 2024 WL 1073121, at *14 (S.D.N.Y. Jan. 23, 2024), *report and recommendation adopted*, 2024 WL 1073155 (S.D.N.Y. Feb. 7, 2024). For example, the SAC does not allege that the Restaurant Defendants verified the number of hours Plaintiffs worked and conveyed that information to Plaintiffs' direct employer, Major Cleaning. *See id.* Accordingly, this factor weighs against a finding of formal control for the Restaurant Defendants, as well. *See, e.g., Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 456 (S.D.N.Y. 2019) ("this is not a case such as *Barfield*, where the employer signed off on the time-card, verified the number of hours worked, and then provided records to the contractor") (internal quotation marks and alterations omitted) (citing *Barfield,* 537 F.3d at 136). Because each of the *Carter* factors weighs against a finding of formal control, the Court finds that the Restaurant Defendants did not exercise formal control over Plaintiffs.

### C. Functional Control

In making a determination of whether a purported employer has "functional control" over employees using the *Zheng* test, the relevant factors include: "(1) whether [the alleged joint employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [direct employer] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the alleged joint employer's] process of

production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the alleged joint employer] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the alleged joint employer]." *Zheng*, 355 F.3d at 72.

The Restaurant Defendants argue that the *Zheng* test is inapplicable to this case, as the factors "are relevant in the context of a subcontractor relationship, which does not exist here." (Restaurant Mem. at 8 n.4.) Though the Restaurant Defendants are correct that the factors *can be* relevant to a subcontractor relationship, the Court does not find the argument that the factors are *only* relevant in a subcontractor relationship to be persuasive. In fact, the overwhelming weight of persuasive authority in the circuit examines alleged joint employment relationships under *both* the formal and functional control tests, rather than looking to formal control alone. *See, e.g., Yuan v. AA Forest, Inc.*, No. 20-CV-5484 (AMD)(MMH), 2022 WL 900614, at *3 (E.D.N.Y. Mar. 28, 2022); *Godlewska*, 916 F. Supp. 2d at 262; *Monzano-Moreno v. Libqual Fence Co.*, No. 18-CV-161 (MKB)(AKT), 2021 WL 730663, at *13 (E.D.N.Y. Feb. 5, 2021), *report and recommendation adopted*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021); *Fernandez*, 407 F. Supp. 3d at 456. Furthermore, the authority cited by the Restaurant Defendants wherein a court dispensed with

the *Zheng* factors entirely generally involved a situation where the alleged employer was found to exercise formal control, and thus there was no need to determine whether the employer *also* exercised functional control. *See, e.g., Granda v. Trujillo*, No. 18-CV-3949 (PAE), 2019 WL 367983, at *7 (S.D.N.Y. Jan. 30, 2019); *see also Greenawalt*, 642 F. App'x at 37 ("Because *Carter* defines employment more narrowly than the FLSA requires, satisfying this test is sufficient . . . to show joint employment."). Thus, the Court will also analyze whether the facts alleged in the SAC establish that the Restaurant Defendants had functional control over the Plaintiffs, supporting a finding of joint employment.

*First,* it is clear from the SAC that the Restaurant Defendants' premises were used for the Plaintiffs' work. According to the SAC, each evening into morning, the Plaintiffs would clean the restaurant at which they were staffed by the Major Cleaning Defendants. (SAC at ¶¶37, 40-41, 59-60, 83-84, 96-97.) The SAC also states that each of the Restaurant Defendants "generally provided [Plaintiffs] with the supplies and equipment necessary to perform [their] responsibilities." (*Id.* at ¶¶43, 63, 87, 100.) Accordingly, the first factor weighs in favor of a finding of joint employment under the *Zheng* test.

*Second,* the complaint makes it clear that Major Cleaning, the Plaintiffs' immediate employer, could and did shift as a unit from one putative joint employer to another. As discussed *supra*, when

one restaurant told Plaintiff Cucul that he could not work at the restaurant for several days due to an injury, Defendant Desouza "arranged for Cucul to begin working at a [different] restaurant controlled and operated by Westville Chelsea." (SAC at ¶¶54-55.) Altogether, Plaintiffs were staffed at five separate restaurants during their time working for Major Cleaning, and Major Cleaning itself "purports to be a full-service janitorial and building services firm that provides cleaning services to commercial, industrial, and residential clients." (*Id.* at ¶¶14-18, 30.) Thus, this factor, which is "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client," weighs against a finding of joint employment. *Zheng*, 355 F.3d at 72.

*Third,* the Plaintiffs performed a job—overnight cleaning—that was important to the Restaurant defendants. (SAC at ¶¶39, 61, 85, 98.) Though perhaps not a part of the process of preparing food in the same way as that of a line chef, it is a matter of common sense that janitorial workers are important to the continued operation of a restaurant. It is not clear, however, that the job of overnight cleaning should be considered a "discrete line job" within the context of the *Zheng* test. *Zheng* involved a manufacturing context, and "courts have questioned whether [the third] factor translates well outside of the production line

employment situation." *Godlewska*, 916 F. Supp. 2d at 263 (internal quotation marks and citation omitted); *see also Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 134 (S.D.N.Y. 2011) ("the third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product").

Further, there are no allegations in the SAC that outsourcing overnight cleaning services is a new development "intended to allow the [Restaurant Defendants] to avoid compliance with the FLSA and the NYLL." *Abuladze*, 2024 WL 1073121, at *16. Given the difference in context between the instant case and *Zheng*, and the *Zheng* court's warning not to "interpret the [third] factor quite so broadly" as to implicate "*every* subcontracting relationship," the Court finds that the third factor is inconclusive. *Zheng*, 355 F.3d at 73; *see also Abuladze*, 2024 WL 1073121, at *16 (finding the third *Zheng* factor inconclusive when "Plaintiffs' own SAC, which names 18 Hotel Defendants, suggests that outsourcing concierge services, at least among a certain class of hotels, is reasonably widespread").

*Fourth,* responsibility for cleaning at the restaurants could pass from one contractor to another without material changes. As stated in *Zheng,* "[w]here . . . employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way

support the determination that a joint employment relationship exists." *Id.* at 74. There are no allegations in the SAC that the Plaintiffs were "tied" to the restaurants at which they were assigned by Major Cleaning to work, rather than their "ostensible direct employer" – Major Cleaning. *Id.* In fact, as mentioned previously, both Plaintiffs shifted between restaurants frequently, (SAC at ¶¶35, 55, 82, 95), and the SAC alleges no facts suggesting that had Major Cleaning ceased working with one of the Restaurant Defendants, the individual Plaintiffs would nonetheless continue their work cleaning the restaurant in question. Therefore, because the facts alleged in the SAC show that Plaintiffs worked for the Restaurant Defendants "only to the extent that their direct employer [was] hired by that entity," the fourth *Zheng* factor weighs against finding that the Restaurant Defendants jointly employed Plaintiffs. *Zheng*, 355 F.3d at 74.

*Fifth,* the Court notes that the second *Carter* factor and the fifth *Zheng* factor overlap substantially. *See Godlewska*, 916 F. Supp. 2d at 264 ("[t]he inquiry under [the fifth] factor is 'largely the same' as the inquiry under the second *Carter* factor"); *see also Zheng*, 355 F.3d at 75 ("supervision weighs in favor of joint employment only if it demonstrates effective control of the terms and conditions of the plaintiff's employment"). As discussed in analyzing the second *Carter* factor, although the SAC alleges that employees of the Restaurant Defendants supervised Plaintiffs'

34

work, exercising "some measure of quality control . . . does not demonstrate that [an alleged joint employer] exercised control over the day-to-day schedule and work conditions of [the employees]." *Monzano-Moreno*, 2021 WL 730663, at *11; *see also Hugee*, 2013 WL 4399226, at *5-6 (finding that supervision for purposes of quality control does not support a finding of joint employer status). "Courts instead have distinguished between circumstances where the putative joint employer maintains specific standards to which its contractors and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfies the putative joint employer's expectations, which does not itself establish control of work conditions, and circumstances where the putative joint employer is responsible for the day-to-day management of the contractor's employees." *Vasto v. Credico (USA) LLC*, No. 15-CV-9298 (PAE), 2017 WL 4877424, at *10 (S.D.N.Y. Oct. 27, 2017), *aff'd*, 767 F. App'x 54 (2d Cir. 2019) (internal quotation marks omitted) (citing *Lawrence v. Adderley Indus., Inc.*, No. 09-CV-2309 (SJF), 2011 WL 666304, at *9 (E.D.N.Y. Feb. 11, 2011)). On balance, the Court finds that this functional control factor does not support a finding that the Restaurant Defendants jointly employed Plaintiffs.

*Sixth*, Plaintiffs did not work exclusively or predominately for any of the Restaurant Defendants. As noted by the Restaurant

35

Defendants in their Reply, despite filing a joint motion to dismiss in the instant case, each of the Restaurant Defendants "are separate businesses that have no relation to one another, except perhaps that they contract[ed] with the same third party for after-hours deep cleaning." (Restaurant Reply at 7.) Although Plaintiffs may have worked for one restaurant at any given time, during the period at issue in the case, they were staffed to clean five separate restaurants, including for as little as a one-week period in the case of Fiorello. (SAC at ¶¶2, 5, 95.) Plaintiffs characterize each of these periods of employment as "successive and exclusive terms," (*id.* at ¶2), but there are no facts in the SAC that suggest that Plaintiffs were staffed exclusively at any of the given restaurants relevant to the instant case. Indeed, as discussed several times previously in this order, when Plaintiff Cucul was injured and an employee at Bond 45 stated that he would not be permitted to work at the restaurant "for at least several days," Plaintiff Cucul's direct employer, the Major Cleaning Defendants, simply shifted him to a different restaurant. (*Id.* at ¶¶54-55.) The fact that Plaintiff Cucul was so readily transferred to a separate restaurant leads the Court to conclude, in the absence of any facts to the contrary, that Plaintiffs' employment at any given restaurant was never actually "exclusive." As such, the Court finds that this factor weighs against a finding that the Restaurant Defendants jointly employed Plaintiffs.

36

*Finally,* a district "court is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 355 F.3d at 72.  Plaintiffs argue that "the [Restaurant Defendants] were 'in a position to be aware of and prevent' the wage-hour violations at issue in this action, an additional factor that further warrants a finding of joint employment here." (Pl. Opp. at 12 (quoting *Fernandez*, 407 F. Supp. 3d at 460).)  In *Fernandez*, the plaintiffs were valets who were employed directly by HR Parking Inc., and who worked at an Audi dealership in Manhattan pursuant to a contract between HR Parking and the dealership.  *Fernandez*, 407 F. Supp. 3d at 448.  The contract between HR Parking and the dealership was for a "fixed hourly rate . . . *regardless of whether the hour worked was 'straight time' or overtime*" which the district court found "provided a strong incentive to HR Parking to not pay the proper overtime rate." *Id.* at 460-61 (emphasis in original).  Because the valets also "punched a clock located at [the Audi dealership]" each day they worked, the district court found that the dealership "had unmistakable knowledge of the fact that the valets were working 60 hours a week and would be entitled to overtime." *Id.* at 460.  Accordingly, the district court found that "[a] jury could reasonably infer from these facts that the [Dealership] Defendants knew that the valets were not being paid overtime." *Id.* at 461.

First, compared to the situation in *Fernandez*, there are no facts in the SAC suggesting that the Restaurant Defendants had any knowledge that the Plaintiffs were not properly being paid a minimum wage, overtime, or spread of hours pay.  The SAC does not allege that the Plaintiffs clocked in or out at the Restaurants, or that the Restaurant Defendants had any knowledge regarding the Plaintiffs' hours worked during each week, especially given Plaintiffs worked overnight at times when restaurant employees were not always present.  (SAC at ¶¶44, 89-90, 103.)  The SAC does state that Plaintiff Cucul "openly discussed his wages with supervisors and staff [at Bond 45 and the Westville Restaurants]," (*id.* at ¶¶50, 72), and that some of the employees at those restaurants indicated they would "speak to Desouza" about securing Plaintiff Cucul a raise, (*id.* at ¶¶51, 74).  Notwithstanding the fact that these portions of the SAC further suggest that the Restaurant Defendants did not have input into Plaintiffs' rate or method of pay, given any discussions that the supervisors may have had did not result in a raise, the situation is still not analogous to *Fernandez*, where the alleged joint employers had actual knowledge of the hours plaintiffs worked.  *Fernandez*, 407 F. Supp. 3d at 460.  Second, although Plaintiffs also allege that "the amounts paid by the Restaurant Defendants to Major Cleaning did not meet the minimum wage thresholds," the SAC offers no facts in support of this contention, as previously discussed *supra*, and the

Court need not credit conclusory statements. (*Id.* at ¶34.) Because of the factual differences between the instant case and *Fernandez*, the Court finds that, based on the facts alleged in the SAC, the Restaurant Defendants were not in a position to be aware of and prevent any wage-hour violations by the Major Cleaning Defendants.

In conclusion, the Court finds that only the first *Zheng* factor weighs in favor of a finding of joint employment by the Restaurant Defendants, the third factor is inconclusive, and the second, fourth, fifth, and sixth factors weigh against a finding of joint employment. Noting that the fifth *Zheng* factor "is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs," the Court finds that the Restaurant Defendants did not exercise functional control over Plaintiffs, and a finding of joint employment is not warranted. *Godlewska*, 916 F. Supp. 2d at 264; *see also Monzano-Moreno*, 2021 WL 730663, at *17 ("most importantly, the fifth functional control factor is not satisfied; Defendants did not supervise plaintiffs' work, manage plaintiffs on a day-to-day basis, or evaluate plaintiffs' performance beyond quality control assessments") (internal quotation marks and citation omitted).

**D.  Joint Employment**

Given the Court's findings utilizing both the formal and functional control tests, this is a case in which the Court can

"conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, [the Restaurant Defendants] are still entitled to judgment as a matter of law." *Zheng*, 355 F.3d at 76. "To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76–77 (emphasis in original). Nevertheless, accepting the factual allegations contained in the SAC as true for purposes of the Restaurant Defendants' motion to dismiss, almost every factor weighs against finding that the Restaurant Defendants jointly employed Plaintiffs. The only factor weighing in favor of such a finding is that the Plaintiffs worked at the Restaurant Defendants' premises, using their supplies. The Court concludes that the first *Zheng* factor standing alone does not, as a matter of law, warrant the conclusion that the Restaurant Defendants jointly employed the Plaintiffs.[5]

---

[5] The Court notes that other district courts outside the Second Circuit have come to a similar conclusion regarding joint employment, under the FLSA, of overnight cleaning staff by the cleaning company's customer. For example, in *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762 (D. Md. 2008), the district court, after discussing the *Zheng* test from the Second Circuit, found that a movie theater was not a joint employer of overnight cleaning workers who were employed by a separate direct employer with which the movie theater contracted. *Id.* at 776 ("If what Plaintiffs argue were to prevail, it would virtually have the effect of converting every business entity that contracts with a janitorial cleaning company into its own 'janitorial maintenance operation' after normal business hours, thus improperly subjecting it to the obligations under the FLSA. Taking Plaintiffs' argument to its logical extreme, the very courthouse where this Court resides would in effect transform into a janitorial maintenance operation after a full day's work of attending to its judicial functions, since cleaning crews promptly arrive by 5:30pm everyday after official Court business has closed for the day.") Similarly, *Politron v. Worldwide Domestic Services, LLC*, 2011 WL 1883116 (M.D. Tenn. May 17, 2011), the district court, again citing the *Zheng* test, found that contracted overnight cleaning staff at a Chili's restaurant were not jointly employed by the

Because the Court finds that the Restaurant Defendants neither formally nor functionally controlled Plaintiffs, the Restaurant Defendants cannot be held liable for the claimed FLSA and NYLL violations as joint employers.[6] Therefore, Plaintiffs' claims are dismissed as to the Restaurant Defendants.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **granted** in their entirety. Plaintiffs' claims against the Restaurant Defendants are dismissed because the Restaurant Defendants did not "employ" Plaintiffs for purposes of the FLSA or the NYLL. Plaintiffs' fifth and sixth causes of action are dismissed for lack of subject matter jurisdiction.

Fed. R. Civ. P. 15(a) provides that leave to amend a complaint shall be freely given "when justice so requires." The Second Circuit has advised that "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cruz v. TD Bank,*

---

restaurant, despite using "some equipment from the restaurants" while cleaning. *Id.* at *3.

[6] For entities that do not meet the joint employer test, courts in this circuit "have also applied the 'single integrated enterprise' test to 'assess whether a group of distinct but closely affiliated entities should be treated as a single employer for FLSA purposes.'" *Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, No. 16-CV-5735 (GHW), 2017 WL 2600051, at *6 (S.D.N.Y. June 15, 2017) (quoting *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014)). "Under that test, courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (internal quotation marks and citation omitted). The SAC includes no allegations that the Restaurant Defendants and Major Cleaning constitute a "single integrated enterprise," nor do Plaintiffs argue against dismissal on that basis in the alternative. Accordingly, the Court finds that the single integrated enterprise test does not prevent dismissal of the claims against the Restaurant Defendants.

*N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citing *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)). Thus, the Court will consider granting leave to amend the complaint, consistent with this Memorandum and Order, if Plaintiffs move to do so by June 20, 2024, and append a proposed Amended Complaint that addresses the factual deficiencies discussed in this Memorandum and Order regarding the lack of concrete injury along with the remaining Restaurant Defendants' status as Plaintiffs' joint employer. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.")

The parties shall meet and confer and jointly advise the Court on the docket, no later than June 6, 2024, how they intend to proceed regarding further amendment of the complaint.

**SO ORDERED**

Dated:    May 30, 2024
          Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York